IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| THOMAS KARMATZIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 11-CV-3373 |
| | ) | |
| DEFENDANT FUQUA, et al. | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

SUE E. MYERSCOUGH, U.S. District Judge.

Plaintiff, proceeding pro se, pursues claims for deliberate indifference to his serious medical needs and retaliation for filing grievances. He is currently incarcerated in Pontiac Correctional Center, but his claims in this case involve his stay in Western Illinois Correctional Center.

Defendants move for summary judgment. In sum, the evidence shows that Dr. Baker, Plaintiff's treating physician at Western, was responsive to Plaintiff's medical complaints, exercising his professional judgment. Further, no evidence supports a claim for retaliation against any Defendants. The only

issue that gives the Court pause is Dr. Baker's handling of lung

nodules reported on a CT scan of Plaintiff's lungs. Summary

judgment will be granted to Defendants on all claims except for the

lung nodule claim against Dr. Baker.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows

that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). A movant may demonstrate the absence of a material

dispute through specific cites to admissible evidence, or by showing

that the nonmovant "cannot produce admissible evidence to

support the [material] fact." Fed. R. Civ. P. 56(c)(B). If the movant

clears this hurdle, the nonmovant may not simply rest on his or her

allegations in the complaint, but instead must point to admissible

evidence in the record to show that a genuine dispute exists. Id.;

Harvey v. Town of Merrillville, 649 F.3d 526, 529 (7th Cir. 2011).

"In a § 1983 case, the plaintiff bears the burden of proof on the

constitutional deprivation that underlies the claim, and thus must

come forward with sufficient evidence to create genuine issues of

material fact to avoid summary judgment." McAllister v. Price, 615

F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant.  <u>Id.</u>

## FACTS

These facts are set forth in the light most favorable to Plaintiff, for purposes of this order only.  Cites to Defendants' undisputed facts refer to the motion for summary judgment filed by Defendants Dr. Baker, et al.

Plaintiff filed his Complaint in October of 2011 from Western Correctional Center, seeking damages, medical care, and a soy-free diet.  He was transferred to Menard Correctional Center in September or October of 2012, mooting his claims for injunctive relief.  (10/1/12 Change of Address, docket.)  Remaining are Plaintiff's claims arising from his incarceration in Western Illinois Correctional Center from June 29, 2011, to September or October of 2012.  Plaintiff was also incarcerated in Western Illinois

Correctional Center for a month beginning in February of 2011, but none of the incidents giving rise to Plaintiff's claims arose during that time. Defendant Dr. Baker, Plaintiff's treating doctor at Western, did not become Western's Medical Director until April of 2011.

Plaintiff is a veteran. His medical history before his incarceration in January of 2011 is lengthy, complicated, and sad. In March of 2009, Plaintiff had lumbar spine fusion surgery. Complications arose, requiring the removal of some of Plaintiff's colon and small bowel, a temporary ileostomy, and other abdominal surgery. (Defs.' Undisputed Fact 5.) Plaintiff developed mesenteric ischemia,[1] which led to additional abdominal surgeries. (Defs.' Undisputed Fact 6.) In October of 2009. Plaintiff developed enterocutaneous fistulas, which is "an abnormal connection between the gastrointestinal (GI) tract and the skin." "Postoperative Enterocutaneous Fistula: When to Reoperate and How to Succeed," J. Clin. Colon Rectal Surg. Nov. 2006, 19(4): 237-246 ("The development of an enterocutaneous fistula (ECF) is a potentially

---

[1] "Mesenteric artery ischemia occurs when there is a narrowing or blockage of one or more of three major arteries that supply the small and large intestines." MedlinePlus, www.nlm.nih.gov (last visited 9/3/14).

catastrophic postoperative complication.").  All these major problems, in addition to others, caused Plaintiff to suffer chronic pain which unfortunately led to a serious and debilitating addiction to pain medicine and concomitant attempts to manipulate health care providers into prescribing more pain medicine.  (Defs.' Undisputed Facts 5-22.)  Plaintiff objects to the characterization that he was drug-seeking, but he admits that he needed more and more pain medicine over time because his body had become acclimated.

When Plaintiff was transferred to Western Correctional Center on June 29, 2011, he was 49 years old, six feet three inches, about 230 pounds, with normal vital signs, and taking Metamucil, HCTZ, Lopressor, ECASA, Colace, and Ultram.  He also used a cane, a low bunk/low gallery permit, non-standard issue tennis shoes which he had bought at the commissary ("Skechers"), and an abdominal binder for his abdominal hernias.[2]  (IDOC Recs. 47.)

Upon intake at Western on June 29, 2011, Plaintiff was scheduled for an appointment with the doctor on July 11,

_____

[2] HCTZ stands for Hydrochlorothiazide, a diuretic.  Lopressor is for high blood pressure. ECASA stands for enteric coated acetylsalicylic acid, a fancy name for coated aspirin.  Ultram is a pain reliever.  MedlinePlus, www.nlm.nih.gov (last visited 9/3/14.)

hypertension labs on July 5, and an EKG on July 2, 2011. Per Dr.

Baker's standard practice, Plaintiff's low bunk and low gallery

permits were discontinued until Dr. Baker personally evaluated

Plaintiff.  Plaintiff contends that Nurse Still and/or Nurse Hazelrigg

were the ones who discontinued those permits, but the record

shows that Nurse Still did so pursuant to Dr. Baker's order.  (Still

Aff. paras. 3-4.)  Dr. Baker's practice is to discontinue the permits

for transferees with "no recent surgery, no blindness, no history of

seizures, no amputations, no morbid obesity, and under the age of

65, . . . in light of the limited placements available at Western

Illinois Correctional Center . . . ."  (Dr. Baker Aff. para 12.).

According to Plaintiff, during Plaintiff's stay in Western a few

months earlier, the low bunk and low gallery permits had been

approved without delay.  (6/29/11 Grievance.)

Plaintiff filed a grievance the same day—June 29, 2011—

seeking permits for a low bunk and low gallery, his Skecher shoes,

and help with his gastrointestinal problems.  (6/29/11 grievance.)

Dr. Baker saw Plaintiff for an initial visit on July 11, 2011.

Plaintiff reported blood in his stool, kidney stones, high blood

pressure, back pain, lung nodules, and trouble urinating.  Dr.

Baker noted that a hemoccult test done in April was positive and a stool sample taken on July 11, 2011 was negative. Dr. Baker reviewed Plaintiff's medical chart, vital signs, and family history. Dr. Baker examined Plaintiff, finding Plaintiff with normal bowel sounds, no exterior anal skin tags, and a possible enlarged prostate "with no tenderness, no nodules, and no masses." (Dr. Baker Aff. paras. 13-14.) Dr. Baker prescribed the same prescriptions which Plaintiff had when he transferred to Western, in addition to Tylenol. Dr. Baker also prescribed a cane, low bunk and low gallery permits, an abdominal binder, and a permit for Plaintiff to keep his pair of Sketchers. Dr. Baker ordered Plaintiff's records from the Veterans Administration hospital, blood tests and follow-up labs regarding the rectal bleeding and a weekly weight check. Id.

On July 15, 2011, Officer Gille, who is not a Defendant in this case, wrote a disciplinary report against Plaintiff for failing to produce a urine sample for a random drug screen. Major Kuntz (also not a Defendant in this case) placed Plaintiff in temporary confinement, pending a disciplinary hearing. Four days later, the hearing was held and the ticket was expunged because the health care staff confirmed Plaintiff's difficulty urinating due to his medical

conditions. (7/15/11 disciplinary report; 7/19/11 Adjustment Committee Final Summary Report.)

On July 18, 2011, Plaintiff went to the morning medicine line ("med line") without his cane. Nurse Still told Plaintiff that Plaintiff was required to have the cane with him at all times. Defendants assert that Plaintiff again appeared at the morning med-line two days later without his cane, but Plaintiff denies this. However, Plaintiff does not dispute that security staff reported to Nurse Still that "Plaintiff had left his cane unattended in the dayroom and that upon a correctional officer seeing the Plaintiff, the Plaintiff sprinted from the front door to his cell to retrieve the cane." (Defs.' Undisp. Fact 54.) Nurse Still reported this information to Dr. Baker.

Dr. Baker saw Plaintiff on August 4, 2011, in part to determine Plaintiff's need for special, prescribed orthotic shoes other than the Skechers and Plaintiff's need for the cane, in light of the observations by others that Plaintiff had left his cane unattended. Dr. Baker examined Plaintiff's feet, finding no gross deformities or calluses and no appreciable difference in size. Dr. Baker concluded that the Skechers were sufficient and that no special shoes were necessary. Dr. Baker also revoked Plaintiff's

cane permit, based on the reports that Plaintiff had been seen three times without the cane. (Defs.' Undisputed Fact 61.) An unattended cane is a security risk: Plaintiff admits that "around this time an incident occurred at the Western Illinois Correctional Center in which an inmate was beaten with a cane." (Defs.' Undisputed Fact 62.)

Dr. Baker saw Plaintiff the following week, on August 11, 2011, for Plaintiff's reports of constipation or blood in his stool. Plaintiff reported straining during bowel movements and occasional blood from anal fissures. Dr. Baker examined Plaintiff, diagnosing benign prostatic hyperplasia (prostate enlargement), constipation, and hemorrhoids. Hytrin was prescribed for the benign prostatic hyperplasia, and Plaintiff's Metamucil and Colace were continued. Plaintiff was provided with hemorrhoid cream and advised to increase his fluids. (Defs.' Undisputed Fact 64.)

Dr. Baker saw Plaintiff about two and ½ weeks later, on August 30, 2011, regarding Plaintiff's complaints of acne, jock itch, allergies, dandruff, and indigestion. Upon examination, Dr. Baker did not observe jock itch or dandruff. Dr. Baker prescribed Mintox

for the indigestion, Benzoyl Peroxide for Plaintiff's mild acne, and Chlor-Trimeton for Plaintiff's allergies.  (Defs.' Undisp. Fact 69.)

Dr. Baker saw Plaintiff again on September 16, 2011, about two weeks later.  Plaintiff complained of muscle spasms and reported that the Ultram and Tylenol were not helping for his back and hip pain.  Plaintiff said that Baclofen, a muscle relaxer, had helped in the past, so Dr. Baker prescribed Baclofen.  By this time Plaintiff's medical records from the Veterans Administration had been received and were reviewed by Dr. Baker.  (Defs.' Undisputed Fact 71.)

On September 21, 2011, security staff reported to the nursing staff that Plaintiff was lifting weights in the yard—bench pressing and lifting weights over his head.  Plaintiff was referred to Dr. Baker for a possible yard restriction.  Dr. Baker saw Plaintiff on September 23, 2011, and decided not to change Plaintiff's restrictions at that time.  (Defs.' Undisputed Facts 90.)

On September 25, 2011, Plaintiff filed a grievance against a nurse whom Plaintiff accused of verbally berating him for signing up for sick call so frequently.  (9/25/11 grievance.)

On September 26, 2011, Nurse Still issued Plaintiff eyeglasses and an abdominal binder. The same day a knee brace was stolen from the health care center. Plaintiff's cell was searched while Plaintiff was kept waiting for over two hours at the health care unit—no brace was found. (Defs.' Undisputed Fact 92; 9/26/11 grievance.) Plaintiff filed a grievance about this incident the same day. (9/26/11 grievance.)

On September 28, 2011, Plaintiff filed a grievance about rude remarks made by Nurses Bradbury and Boyd at sick call regarding Plaintiff's frequent attendance at sick call.

Dr. Baker saw Plaintiff on November 30, 2011. Plaintiff said his current pain medicine dosages were no longer working well and that he needed a stronger dose of Baclofen because the weather was turning colder, which Plaintiff maintained worsened his pain. Plaintiff also asked for an increase in his allergy pills. Plaintiff does not dispute that he was walking with a normal gait and had normal voice, speech and facial expressions. Dr. Baker's exam of Plaintiff was normal, and Dr. Baker could not feel muscle spasms. Aware of Plaintiff's history of addiction to pain medicine and having observed Plaintiff moving normally, Dr. Baker concluded that Plaintiff did not

need more Baclofen. Dr. Baker did order an increased dose of allergy medicine and renewed Plaintiff's current dose of Baclofen, Ultram, and Tylenol, as well as prescribing muscle balm. (Defs.' Undisputed Fact 96.)

For about two and ½ weeks, Plaintiff was accidentally given more Baclofen than Dr. Baker had prescribed. When the mistake was corrected, Plaintiff asked that his Baclofen be increased because he had been feeling better on the increased dose.

Dr. Baker saw Plaintiff on January 10, 2012, due to reports that Plaintiff had used 180 Colace pills in 10 days and 30 Chlor-Trimeton pills in eight days. Dr. Baker determined that Plaintiff might be overusing these medicines but also may have just turned his medicine cards in too early for refills. (Defs. Undisputed Fact 103.)

On January 11, 12, 13, and 17, 2012, Plaintiff asked for refills of medications and creams which Plaintiff claimed had been confiscated in a search of his cell. On January 18, 2012, Plaintiff turned in three empty medicine packets, but the nurses determined that refills on the medicine were not due. Plaintiff again asked for unnecessary refills on January 19, 2012. (Defs.' Undisputed Facts

12

105-110.)  At this point security staff was notified and a nurse or nurses asked the security staff to search Plaintiff's room for medications.  That search turned up the following medications: 112 Tylenol capsules, 30 Metamucil packets, and 69 Colace pills. (Defs.' Undisputed Fact 114.)  The cream which Plaintiff had claimed was confiscated was also found in his cell.

In light of the medicine found in Plaintiff's cell, Nurse Mills directed that Plaintiff be placed on "watch take," meaning that he had to take his medicine in front of a nurse and could not keep medicine in his cell.  (Defs.' Undisputed Fact 115.)  Plaintiff was also written a disciplinary ticket by Nurses Still and Hite on January 19, 2012.  The Adjustment Committee found Plaintiff guilty of possessing excess medication and lying to the nurses. Plaintiff was punished with a one month grade demotion, 15 days in segregation, and one month of commissary restriction.  (1/26/12 Adjustment Committee Hearing Report.)

In February of 2012, Plaintiff began asking for Neurontin, another kind of pain reliever, asserting that the Ultram was no longer working.  He also continued to ask for an increase in his Baclofen.  Plaintiff does not dispute that he was able to go about his

usual daily routine and was observed by Dr. Baker as being in no acute distress with a steady gait and normal blood pressure and heart rate. (Defs.' Undisputed Fact 123-24.)

Dr. Baker saw Plaintiff on March 7, 2012. Plaintiff asked for a new abdominal binder and knee brace because of stiffness and pain in his knee. He again asked to increase his Baclofen and receive Neurontin. Plaintiff admitted that he had not been taking his Ultram because he had been moved to a housing unit farther away from the med line. Dr. Baker's exam of Plaintiff's legs and knees were normal, with decreased flexion but no instability. Dr. Baker concluded that Plaintiff did not need a knee brace, but Dr. Baker did order an abdominal binder, a continuation of Plaintiff's current medicines, and a transfer of Plaintiff to a housing unit closer to the med line.

Dr. Baker saw Plaintiff on March 22, 2012 regarding complaints of chest pain and lung nodules. Before Plaintiff's incarceration, a CT scan in March of 2010 had shown:

> Multiple indeterminate noncalcified pulmonary nodules. Largest nodules measure 6 mm in the right lower lobe, an 11 mm at the left lower lobe. While these may be inflammatory in nature, neoplasm or metastatic disease cannot be excluded.

Previous granulomatous disease.  Multiple calcified lung granuloma noted as well.

Primary Diagnostic Code:  ABNORMALITY, ATTN. NEEDED

(3/23/10 Radiology Report, 238-3, p. 10.)  X-rays of Plaintiff's lungs had been taken in April 2011 in Lawrence Correctional Center.  Dr. Baker ordered additional x-rays to compare with the April 2011 x-rays, which were done in March of 2012.  Dr. Baker noted in Plaintiff's records that no nodules were found on the March 2012 x-ray, but the March 2012 x-ray report actually states that bilateral lung nodules were present.  (IDOC Rec. 219.)  The March x-ray report also states prior films were not available for comparison, and that, "[d]ue to [the lung nodules'] small size, comparison may be better performed with a CT scan."  Id.  The April 2011 x-ray had reported that hyperexpansion of the lungs was consistent with emphysema.  (IDOC Rec. 217.)  Dr. Baker ordered a follow-up x-ray in September of 2012, which reported:

FINDINGS: Correlation is made to patient's previous radiographic examination of the chest from 03/26/2012.

Scattered bilateral calcific nodules are seen in the lungs without significant change. Findings likely represent exposure to granulomatous antigen.

The lungs remain well expanded.

Degenerative changes of the thoracic spine are stable.

The heart is normal.  There is [sic] no active infiltrates.

IMPRESSION:  Essentially stable chest. Chronic granulomatous changes. No significant change since the previous study.

(IDOC Rec. 220.)

On May 4, 2012, Dr. Baker saw Plaintiff for complaints of constipation and pain.  At that time, Plaintiff was taking Baclofen, Ultram, Tylenol, and muscle balm for his pain, and Colace and Metamucil for his constipation.  Plaintiff again asked for an increase in his Baclofen and the addition of Neurontin for pain relief.  Dr. Baker's physical exam was normal, and Dr. Baker found Plaintiff in no observable distress.  Nevertheless, Dr. Baker acquiesced in part to Plaintiff's request and increased Plaintiff's Baclofen dosage. (Defs.' Undisputed Fact 134.)

Dr. Baker again saw Plaintiff on May 24, 2012, for Plaintiff's continued complaints of pain.  Plaintiff again asked for Neurontin. Dr. Baker again noted that Plaintiff was able to carry on his daily

activities, had a normal gait, and was not in observable distress. Dr. Baker suggested a low-dose anti-depressant, instead of Neurontin, but Plaintiff declined. Dr. Baker did not want to prescribe Neurontin because Neurontin is addictive, and Plaintiff was already on Ultram, Tylenol, and Baclofen for pain. Dr. Baker prescribed topical Capsaicin to help with Plaintiff's pain.

On June 15, 2012, nursing staff received a call from Officer Roberts, informing the nursing staff that "Plaintiff was out on the yard, lifting weights, and doing curls with weights without any problems." (Defs.' Undisputed Fact 142.)

Dr. Baker saw Plaintiff on June 25, 2012, for continued complaints of pain. Plaintiff reported that the Capsaicin cream burned and when the heat wore off the pain returned. Dr. Baker discontinued the cream and acquiesced to Plaintiff's request for Neurontin. (Defs.' Undisputed Fact 144.)

Dr. Baker saw Plaintiff on August 21, 2012 because Plaintiff was concerned that the Neurontin had worsened Plaintiff's prostate enlargement. Dr. Baker learned at that time that the Neurontin dosage had been increased by a different doctor during Plaintiff's visit to a hypertension clinic. Dr. Baker increased Plaintiff's

17

prostate medicine, Terazosin, and ordered Proscar, also a medicine used to treat benign prostatic hypertrophy. MedlinePLus, www.nlm.nih.gov (last visited 9/3/14.) Dr. Baker also told Plaintiff that seeking an increase in the Neurontin from a different doctor was, in Dr. Baker's opinion, drug-seeking behavior. (Defs.' Undisputed Fact 153.)

Sporadically, Plaintiff's various medicines were out of stock. In September of 2011, Plaintiff's Baclofen was unavailable on two days, and three doses of Baclofen were missed in October. All of the Baclofen doses were given from November 2011 through February 2012. In March, 2012, Baclofen was unavailable for one dose, for two days in May, and two days in June. Throughout this period, Plaintiff had Ultram and Tylenol available to him for pain relief.

## ANALYSIS

The Eighth Amendment to the U.S. Constitution prohibits deliberate indifference to an inmate's serious medical needs. Gomez v. Randle, 680 F.3d 859, 865 (7th Cir. 2012). Concluding that Plaintiff had serious medical needs is not difficult. The

question is whether the record supports a reasonable inference of deliberate indifference.

Deliberate indifference is the conscious disregard of a known and substantial risk of serious harm to an inmate—a knowing refusal to take reasonable measures to address that risk. Gomez, 680 F.3d at 865; Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011). Malpractice—the failure to act as a reasonably careful doctor would—is not enough to show deliberate indifference. Roe v. Elyea, 631 F.3d 843, 858 (7th Cir. 2011)("'[T]he Eighth Amendment does not codify common law torts.'")(quoted cite omitted). Deviation from the standard of care is not automatically deliberate indifference: the deviation must be "'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" Roe, 631 F.3d at 857 (quoted cite omitted).

Plaintiff argues that Defendants were deliberately indifferent to his chronic pain, kidney stones, difficulty urinating, lung nodules, need for low bunk/low gallery/cane, need for a soy-free

diet, rectal bleeding, difficulty with bowel movements, and blood in his urine.

The record allows no reasonable inference of deliberate indifference to Plaintiff's pain.  True, debilitating, chronic pain is a serious medical need, and "pain" is subjective.  <u>Gutierrez v. Peters</u>, 111 F.3d 1364 (7th Cir. 1997)(chronic and substantial pain is a serious medical need); <u>Hendrickson v. Cooper</u>, 589 F.3d 887, 893 (7th Cir. 2009)( Pain is "uniquely subjective.").  But the question is not whether Plaintiff was in pain but whether Defendants were deliberately indifferent to that pain.  Plaintiff must have evidence that the response to Plaintiff's complaints of pain were "so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded Plaintiff's needs." <u>Hayes v. Snyder</u>, 546 F.3d 516, 524 (7th Cir. 2014)(inference of deliberate indifference arose where doctor testified that inmates never needed prescription-strength pain killers).

Plaintiff was prescribed prescription-strength pain killers and muscle relaxants throughout the relevant time period:  Ultram and Baclofen, and then Neurontin.  He was also prescribed Tylenol (which he hoarded in his cell), analgesic balms and creams, low

bunk/low gallery permits, permission to have his Sketchers tennis shoes, and a transfer to a housing unit close to the med line. He was offered a low-dose anti-depression medication for his pain which he refused. He does not dispute that he was able to carry about his daily activities, was seen lifting weights, and for a time chose not to take his Ultram. He does not dispute Dr. Baker's observation that during Dr. Baker's exams of Plaintiff, Plaintiff was moving about normally and in no apparent acute distress. Plaintiff wanted a higher dose of Baclofen and Neurontin, but what Plaintiff wanted does not dictate the standard of care. Plaintiff does not have a constitutional right to dictate what pain medicine he receives and in what doses. Arnett v. Webster, 658 F.3d at 355. Plaintiff has no evidence that Dr. Baker's approach to relieving Plaintiff's pain deviated from the standard of care, much less substantially so.

Plaintiff asserts that he received no treatment for his self-reported kidney stones. The IDOC intake from February 2011 stated that Plaintiff self-reported kidney stones since 2010, but Plaintiff does not explain why he thinks he has kidney stones or point to any test showing that he has kidney stones. He points to no evidence showing where the stones are located, the size of the

21

stones, or suggesting that he needs treatment for them. Symptomatic kidney stones could cause blood in the urine, and Plaintiff had a trace of blood in his urine in February of 2011. However, the labs conducted the following April or July and in March of 2012 were clear for blood in the urine. (IDOC Recs. 226, 230, 238.) Plaintiff asserts that the kidney stones were causing his difficulty urinating, but Plaintiff has no evidence to dispute Dr. Baker's conclusion that an enlarged prostate was causing that difficulty, for which Dr. Baker prescribed medicine. No reasonable juror could find that Plaintiff's self-reported kidney stones posed a serious medical need, much less that Dr. Baker was deliberately indifferent to that need.

Plaintiff also has no evidence that he had a medical need for a soy-free diet. (Pl.'s Dep. p. 51, acknowledging that he was never diagnosed with a soy allergy before or during his incarceration.) Plaintiff's intestinal and other medical problems began long before he was incarcerated and served prison food, and Plaintiff's weight in Western remained stable. The Constitution does not require a prison doctor to rule out every medical diagnosis hypothesized by an inmate. *See* <u>Forbes v. Edgar</u>, 112 F.3d 262, 266-67 (7th Cir.

1997)(Eighth Amendment does not entitle inmates to demand specific treatment). Plaintiff's assertion that soy caused his problems is speculation, and speculation does not create a material issue of disputed fact. *See* <u>Davis v. Carter</u>, 452 F.3d 686, 697 (7th Cir. 2006)("[W]hen the evidence provides for only speculation or guessing, summary judgment is appropriate.") Plaintiff has no evidence to dispute the accuracy of Dr. Baker's diagnosis of constipation and hemorrhoids to explain Plaintiff's occasional rectal bleeding. Dr. Baker was responsive to those conditions by prescribing Colace and Metamucil and by ordering repeat hemoccult tests.

As for the low bunk/low gallery permit, a 12-day delay did occur before those permits were renewed, pursuant to Dr. Baker's policy to temporarily discontinue the permits for new arrivals until an exam by a doctor, given the limited availability of low bunk/low gallery assignments. But Plaintiff has no evidence that this relatively short delay amounted to deliberate indifference to a known and serious need of Plaintiff for a low bunk/low gallery. Plaintiff does not even say where he was assigned during this period or that he slept on a high bunk during this period. Regarding

Plaintiff's cane, he does not seem to dispute that he did not have a medical need for the cane. He does not dispute that he appeared at the med line at least once without it and was reported by security to have left the cane unattended in the dayroom.

The only medical condition which gives the Court pause are the lung nodules discovered on the 2010 CT scan before Plaintiff was incarcerated. The 2010 report essentially states that cancer could not be ruled out and that attention was needed. Dr. Baker did order x-rays, but he does not explain why a CT scan was not ordered instead, particularly since the March 2012 x-ray report stated that "comparison may be better performed with a CT exam." Dr. Baker also incorrectly asserts that the x-rays he ordered did not show nodules. Plaintiff's lung nodules may well be benign, particularly given that Plaintiff's condition has remained stable over the passage of time, and the x-rays might have been an appropriate choice over a CT scan. *See* Ray v. Wexford Health Sources, Inc. 706 F.3d 864 (7th Cir. 2012)(per curiam)(refusal to order MRI regarding inmate's shoulder pain was not deliberate indifference where inmate received pain medicine, frequent exams, and x-rays.); Olive v. Wexford Health Sources, Inc., 501 Fed.Appx. 580 (not

published in federal reporter)(7th Cir. 2013)("[T]he Constitution does not require physicians to use MRI scans when they conclude, in the exercise of professional judgment, that x-rays suffice for diagnosis.").  However, the Court cannot tell on this record that the lung nodules are in fact benign and also cannot determine whether Dr. Baker's chosen diagnostic tests were a substantial departure from accepted professional practice in light of the 2010 CT scan. Summary judgment will, therefore, be denied to Dr. Baker on the lung nodule claim, with leave to file a supplemental motion.

Summary judgment will be granted to the remaining Defendants on Plaintiff's medical claims.  No evidence of deliberate indifference arises against the nurses or the administrative defendants.  The nurses referred Plaintiff to the doctor frequently and followed the doctor's orders.  No evidence suggests that the doctor's orders posed any obvious risk to Plaintiff or failed to address an obvious risk of which the nurses were aware.  *Cf.* Holloway v. Delaware County Sheriff, 700 F.3d 1063, 1075 (7th Cir. 2012)( "Nurse can be deliberately indifferent if she 'ignore[s] obvious risks to an inmate's health' in following physicians orders.")(quoted cite omitted); Berry v. Peterman, 604 F.3d 435, 443 (7th

Cir.2010)(nurse's deference "may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient."). Additionally, no evidence suggests that the nurses were responsible for the sporadic and short-lived occasions when some of Plaintiff's medicines were out of stock. Even if they were responsible for those isolated incidents, the deprivation did not arise to a constitutional violation. *See* Zentmyer v. Kendall County, 220 F.3d 805 (7th Cir. 2000)("[D]eliberate indifference is an onerous standard for the plaintiff, and forgetting doses of medicine, however incompetent, is not enough to meet it here.")

As for Defendants Fuqua and Martin, the health care unit administrators, they had no authority to override the doctor's decisions. The job of the health care unit administrators is to ensure that Plaintiff had access to medical care, which Plaintiff had in abundance.

Remaining is Plaintiff's claim that he was retaliated against for filing grievances about his medical care and the nurses purported misconduct. To survive summary judgment, Plaintiff must first show that Defendants' adverse actions were motivated, at least in part, by retaliation for Plaintiff's grievances. Defendants then must

rebut this inference with evidence that the adverse action would have occurred anyway.  The burden then shifts back to Plaintiff, who must have evidence that Defendants' innocent explanation is pretextual.  In other words, Plaintiff must have evidence that the adverse action would not have occurred but for the retaliatory motive.  Thayer v. Chiczewski, 705 F.3d 237, 251 (7th Cir. 2012).

Plaintiff argues that the nurses turned him in regarding leaving his cane unattended, working out in the yard, and the overuse of medicine out of retaliation for his complaints against them.   Plaintiff's allegation of retaliatory motive is based on speculation, which is not enough to counter the undisputedly legitimate reasons for revoking Plaintiff's cane, searching his cell, disciplining him for hoarding medicine and lying to the nurses.  *See* Devbrow v. Gallegos, 735 F.3d 584, 588 (7th Cir. 2013) (prisoner's "speculation regarding the officers' motive cannot overcome the contrary evidence that [Defendants'] actions were benign.")  Plaintiff does not dispute that he in fact did leave his cane unattended (a security risk), was hoarding medicine in his cell, and falsely told the nurses that his medicine had been confiscated.  Plaintiff also does not dispute that security reported to the nursing staff that Plaintiff

had been lifting weights.  Plaintiff has no evidence that the nursing staff typically would overlook these kinds of transgressions.  Even if the nurses were motivated in part by Plaintiff's complaints, the adverse actions would have been taken anyway.  To allow a retaliation claim to go to the jury would be to allow Plaintiff to insulate himself from the consequences of his misconduct by filing grievances before engaging in the misconduct.  For the same reasons, no retaliation claim arises against any of the other Defendants.[3]

## CONCLUSION

Summary judgment for Defendants is granted on all claims against all Defendants, except for Plaintiff's claim against Dr. Baker regarding Dr. Baker's handling of the follow-up regarding the 2010 CT scan which reported noncalcified lung nodules in Plaintiff's lungs.  Dr. Baker may file a supplemental motion for summary judgment is granted.  Meanwhile the case will be set for trial in order to keep the case moving.

---

[3] To the extent Plaintiff alleges that the disciplinary report for failure to produce a urine sample for drug testing was part of these Defendants' retaliation, no evidence suggests that these Defendants wrote or caused that report to be written.  In fact, the record shows that the health care staff helped exonerate Plaintiff on this ticket.

**IT IS THEREFORE ORDERED:**

1. The motion for summary judgment by Defendants Baker, et al., is granted in part and denied in part (231).  The motion is granted as to all of Plaintiff's claims against Defendants Boyd, Bradbury, Hazelrigg, Hite, and Still.  The motion is granted as to all claims against Dr. Baker, except for Plaintiff's claim against Dr. Baker regarding Dr. Baker's handling of the follow-up required regarding the 2010 CT scan which reported noncalcified lung nodules in Plaintiff's lungs.

2. By October 3, 2014, Dr. Baker may file a summary judgment motion on the remaining claim against him.

3. The motion for summary judgment by Defendants Fuqua and Martin is granted  (236).

4. The final pretrial conference is scheduled for January 13, 2015, at 1:30 p.m.  The Court will circulate proposed jury instructions for discussion at the final pretrial conference.

5. An agreed final pretrial order, motions in limine, and alternate or additional instructions are due January 8, 2015.

6. The clerk is directed to terminate Defendants Fuqua, Still, Martin, Bradbury, Boyd, Thompson, Hite, and Hazelrigg.

ENTER:   September 10, 2014

FOR THE COURT:

**s/Sue E. Myerscough**
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE